



# MEMORANDUM OPINION

No. 04-10-00374-CR

Rafael **GARZA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 144th Judicial District Court, Bexar County, Texas
Trial Court No. 2009CR4998B
Honorable Catherine Torres-Stahl, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Phylis J. Speedlin, Justice

Delivered and Filed:  July 6, 2011

AFFIRMED

A jury convicted appellant, Rafael Garza, of aggravated kidnapping and sentenced him to twenty-three years in prison.  In his sole issue on appeal, appellant argues the evidence was legally insufficient to support the element of the offense that appellant used or threatened to use deadly force against the complainant, Ronald Norman.  We affirm.

**BACKGROUND**

On March 27, 2009, Norman and a prostitute went to appellant's house in San Antonio. Norman's and appellant's versions of the events diverge from here.

*Norman's Testimony*

Norman testified he and the prostitute, J.M., went to appellant's house to rent a room for an hour. When they arrived at the house, appellant and another woman were in a bedroom and four or five other men were in the living room. Inside the house, Norman observed "an axe and a big stick" near a hole in the wall. Appellant called J.M. into the bedroom, where they began screaming at each other about a money dispute. Appellant then called out to the other men and said, "Don't let that guy leave." Appellant emerged from the bedroom, and Norman testified he was "put into" a second bedroom by the other men.

In the second bedroom, appellant asked Norman if he had any money. Norman said he did not, but appellant found and removed $140 from Norman's back pocket. Appellant then grabbed Norman's wallet, removed his ATM card, and demanded his pin number, which Norman gave him. Appellant then removed Norman's driver's license and asked who else lived at the address listed and if there were any dogs there. Norman told appellant his brother lived at the house and there were no dogs; however, Norman's brother actually kept a trained German Shepherd at the house. Norman truthfully answered when appellant asked what time Norman's brother left the house every day. Appellant then took Norman's car keys.

Appellant told Norman to turn around and then tied Norman's hands behind his back. Norman was told to lie down with his chin on the floor while appellant tied up his legs. Appellant and the other men put a stool and a tool box on Norman's back, telling him that if he moved they would hear the tool box and would "fuck him up." While appellant was tying up

Norman's legs, appellant and the other men in the room were standing within arm's reach of the pick axe and the stick, but they did not pick up or brandish either item. One of the men said, "Where's the gun?" but Norman never saw a gun and the police did not recover a gun from the house. Norman believed he was not going to leave the house alive.

Appellant and the other woman, who Norman believed was appellant's girlfriend, left the house and returned a little over an hour later. They told Norman they were not able to withdraw more than two hundred dollars from Norman's bank account, and Norman explained to them how they could withdraw more. Appellant untied Norman's legs and moved him to another room, where Norman sat down on a bed. Appellant then answered a knock at the door and began arguing with a neighbor about traffic. The other men in the house told Norman, "Don't say nothing. You better not say nothing." Norman then heard a police siren and one of the other men said, "That Bitch, I hope that Bitch didn't—that Bitch ratted." Norman believed they were referring to J.M.

Appellant went back into the room where Norman was sitting and told someone to go outside and slip a rope through a vent in the wall, which he then used to tie up Norman's legs. Norman heard appellant tell someone to pay someone else twenty dollars to stay and watch him until appellant returned to the house. Appellant left the house and two men continued checking in on Norman at fifteen- to twenty-minute intervals. Three or four hours later, the two men fell asleep in the living room and Norman untied himself and left through the front door. He ran down the street to a bakery and asked someone to call the police.

### Appellant's Testimony

Appellant testified Norman, who regularly purchased drugs from him, arrived at the house with a prostitute named Patty. Patty asked appellant if they could buy drugs and rent a

room for an hour. Appellant rented the room to Norman for fifty dollars and sold him drugs for an additional one hundred dollars. After a while, Patty came out of the room and told appellant that Norman wanted to buy more drugs but needed to go to the ATM. Appellant and Norman agreed that Norman would lend his car to appellant for a couple of hours in exchange for the drugs. Appellant was afraid he would be pulled over and arrested for unauthorized use of the car, so Norman gave him his driver's license as well.

When appellant returned to the house, everyone had left except for Norman and appellant's friend "Primo." Norman asked for more drugs and suggested appellant take his car and use his ATM card and pin to remove the money from his account. Appellant went to the ATM with J.M., who appellant claimed was the woman with him in the house when Norman arrived, and J.M. withdrew the money. J.M. gave appellant one hundred dollars, but appellant did not know if she withdrew more. Appellant and J.M. returned to the house at 3 a.m. after abandoning the car with the keys and Norman's wallet because J.M. had heard on the news that the police were looking for the car.

Appellant testified he never tied up Norman or kidnapped him, and the rope found in the house was used to restrain a dog appellant had kept after a dog fight.

*Police Testimony*

San Antonio police officers testified they were called to a bakery, where they found Norman nervous and scared, with marks on his wrists from being tied up. Detective Gilbert Tovar testified Norman told him he had been tied up and held against his will and threatened with an axe. The police took Norman back to appellant's house, where they woke up two sleeping men and arrested them. Norman identified the men as the ones who had been holding

him captive. Appellant had not yet returned to the house. Later that day, the police found Norman's car abandoned in another location.

The police later discovered that Officer Jose Uribe had encountered appellant and a woman in Norman's car several hours earlier. While parked in a parking lot writing reports, Officer Uribe saw appellant and the woman park Norman's car and enter a store. Appellant came out of the store alone and acted suspiciously, so Officer Uribe made contact with him. Appellant gave Officer Uribe Norman's driver's license, which Officer Uribe ran through his computer system, not realizing that the license did not belong to appellant. Because the license turned up no outstanding warrants, Officer Uribe allowed appellant to leave.

After conferring with Officer Uribe, police officers returned to appellant's house with an arrest warrant for appellant, who was at home when they arrived. At that time, the police also found J.M., who appeared distraught, worn out, and bruised as if she had been beaten up. She told police she was there to collect money she had earned the night before and was being held against her will.

## DISCUSSION

On appeal, appellant argues the evidence was legally insufficient to support the element of the offense that appellant used or threatened to use deadly force against Norman.

In a legal sufficiency challenge to the evidence, we must determine whether, after considering all the evidence in the light most favorable to the verdict, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895, 899 (Tex. Crim. App. 2010). We defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.* at 899.

Here, appellant argues the State's proof "amounts to nothing more than a showing that an instrument *could* have been utilized to inflict death or serious bodily injury." Appellant contends there is no evidence from which a rational jury could find appellant or his accomplices used the pick axe or the stick as "deadly weapons."

The jury was charged as follows:

> Now, if you find from the evidence beyond a reasonable doubt that . . . [appellant], either acting alone or together as a party . . . , with intent to facilitate the commission of a felony, to-wit: robbery, did intentionally or knowingly abduct another person, namely: Ronald Norman, by using or threatening to use deadly force; and without Ronald Norman's consent did restrain Ronald Norman so as to interfere substantially with his liberty, by confining Ronald Norman, then you will find [appellant] guilty of aggravated kidnapping as charged in the indictment.

The jury charge does not mention the pick axe or the stick or any other particular weapon. The charge only requires a finding that appellant used or threatened to use "deadly force" in abducting Norman. Even if Norman was not threatened with the pick axe or the stick, "a threat to use deadly force to abduct a person can be communicated by words alone, separate and apart from exhibiting a deadly weapon." *Ramirez v. State*, 692 S.W.2d 729, 732 (Tex. App.—Waco 1985, no writ); *accord Berry v. State*, 579 S.W.2d 487, 489 (Tex. Crim. App. [Panel Op.] 1979); *Rogers v. State*, 550 S.W.2d 78, 81 (Tex. Crim. App. 1977); *Kenny v. State*, 292 S.W.3d 89, 98 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). In this case, the jury could have disbelieved appellant's version of events and instead believed Norman's testimony that appellant and his cohorts threatened to "fuck him up" if he moved or tried to escape, as well as his testimony that he did not believe he would leave the house alive. For these reasons, we conclude Norman's testimony was legally sufficient to support the jury's finding that appellant, acting alone or with his cohorts, threatened to use deadly force in abducting Norman.

## CONCLUSION

We overrule appellant's issue on appeal and affirm the judgment of the trial court.

Sandee Bryan Marion, Justice

Do not publish